**FERRARA & DiMERCURIO,
INC., Plaintiff,**

v.

**ST. PAUL MERCURY INSURANCE
COMPANY, Defendant.**

**Civil Action No. 94–10574–WAG.**

United States District Court,
D. Massachusetts.

June 5, 1997.

Joseph M. Orlando, Orlando & Associates, Gloucester, MA, for Plaintiff.

Richard H. Pettingell, Pettingell & Regan, Boston, MA, for Defendant.

### ORDER RE: PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO PRODUCE DOCUMENTS AND TO COMPEL DEPOSITIONS (DOCKET ENTRY # 72)

BOWLER, United States Magistrate Judge.

On May 16, 1997, plaintiff Ferrara & DiMercurio, Inc. ("Ferrara") filed a motion to compel defendant St. Paul Mercury Insurance Company ("St. Paul") to produce its entire claims file. On May 20, 1997, Ferrara filed a supplementary pleading elaborating upon its arguments in the original motion. Also on May 20, 1997, this court held a hearing and took the motion under advisement pending further submissions from the parties. On May 21, 1997, St. Paul transmitted the claims file to chambers for an *in camera* inspection. Thereafter, the parties filed further submissions. Finally, in accordance with a May 29, 1997 Procedural Order, St. Paul furnished a privilege log.

At the May 20, 1997 hearing, St. Paul represented, without objection, that it had produced the claims file for materials dated from July 1993 to February 28, 1994. After February 28, 1994, however, St. Paul took the position that the claims file was not relevant and contained privileged materials. After the hearing, St. Paul reevaluated its position and purportedly produced the entire claims file, including materials dated after February 28, 1994, except for the documents noted on the privilege log.[1] The withheld documents constitute either work product or attorney client privileged matters, according to St. Paul.

### BACKGROUND

Ferrara filed this insurance coverage case on March 24, 1994. Jurisdiction is based on diversity of citizenship. The complaint alleges that St. Paul breached the terms of its insurance contract with Ferrara (Count I), violated section three of Massachusetts General Laws chapter 176D ("chapter 176D") (Count II), knowingly and wilfully refused to pay the insurance claim in violation of section nine of Massachusetts General Laws chapter 93A ("chapter 93A") (Count III) and breached the covenant of good faith and fair dealing contained in the insurance contract (Count IV).

Ferrara, the owner of the F/V Two Friends ("the vessel"), was the named insured on a marine insurance policy issued by St. Paul. On July 3, 1993, while the policy was in effect, a fire occurred on board the vessel. Thereafter, Ferrara gave notice of the loss to St. Paul and made a claim for coverage. (Docket Entry ## 1 & 7, ¶¶ 5, 6 & 7; Joint Exhibit No. 1).

The Gloucester Fire Department initially responded to the scene of the fire. According to the incident report, Deputy J. Low concluded that, "the cause of the fire was electrical in nature." (Docket Entry # 14,

---

1. In the event Ferrara disagrees with St. Paul's representation that it produced the claims file except for the documents noted on the privilege log, Ferrara should renew its motion to compel within ten days of the date of this Order.

Ex. A). Similarly, John D. Malcolm ("Malcolm"), an electrical consultant for St. Paul,[2] in a letter dated July 22, 1993, and addressed to Fred S. O'Donnell ("O'Donnell"), concluded that, "the burn patterns around [the] electrical equipment suggest that the fire in this area was a result of an accidental electrical failure." (Docket Entry # 14, Ex. B).

On or about July 4, 1993, a police officer received three telephone calls at home regarding the fire. One of these unidentified telephone callers informed the police officer that, "the boat fire stunk." On or about August 3, 1993, the police officer telephoned Paul S. Olson ("Olson") of St. Paul. As a result of the telephone call, according to St. Paul, it conducted a further investigation of the fire.[3] (Docket Entry # 14, Ex. C; Docket Entry # 17).

In particular, at Olson's request, O'Donnell examined the vessel and issued an opinion to St. Paul's counsel by letter dated September 13, 1993. After observing two separate burn patterns on floorboards, O'Donnell concluded that, the "fire was set to appear to be an accidental electrical fire." He further surmised that the "fire was of an incendiary nature having three separate and distinct points of origin." (Claims File, Nonprivileged Document).

By letter dated September 24, 1993, St. Paul's counsel advised Ferrara that St. Paul's investigation was ongoing and that it was unable to accept or deny the claim at that time. After further investigation, on February 11, 1994, St. Paul's counsel wrote to Ferrara's counsel and formally denied coverage based on misrepresentation. The letter referred to O'Donnell's conclusion and noted Ferrara's financial condition. (Claims File, Nonprivileged Documents).

On March 24, 1994, Ferrara filed the previously described complaint. In August 1995

the trial judge issued a ruling that St. Paul could not refer to the fact of the telephone call from the police officer because the police officer could not "testify as to what somebody told him." When St. Paul's counsel pointed to the relevancy of the police officer's testimony vis-a-vis the chapter 93A bad faith claim, the trial judge severed the chapter 93A claim. (Docket Entry # 17). Ferrara contends, in part, that St. Paul's bad faith continued into the litigation stage when St. Paul failed to settle this action after it became clear that its defense of arson was no longer reasonable. Ferrara submits that this occurred with the trial judge's August 1995 ruling barring St. Paul from referring to the unidentified informant. (Supplemental Memorandum).

Ferrara provides a further example of St. Paul's continuing bad faith which, Ferrara argues, supports the application of the crime fraud exception to the attorney client privilege. By affidavit, Ferrara's counsel states that on March 7, 1997, St. Paul's counsel advised a member of his law firm that St. Paul would not pursue a theory of arson by the insured. Thereafter, Ferrara's counsel met with his clients and informed them that, "their names had been cleared." On March 25, 1997, however, St. Paul's counsel telephoned Ferrara's counsel and advised him that, having spoken with a St. Paul official, St. Paul would be trying the case by claiming arson and fraud on the part of Ferrara. (Supplementary Memorandum).

## DISCUSSION

In seeking to compel the privileged documents, Ferrara makes the following five arguments. First, it contends that St. Paul's conduct after it denied the claim and throughout the instant litigation constitutes bad faith. Thus, the entire claims file contains relevant information. Second, citing

---

2. (Claims File, Nonprivileged Material, Deposition of Pamela L. Shepardson, p. 14).

3. Ferrara maintains that St. Paul acted in bad faith, in part, by sending its investigators back to the vessel to search for arson based on the alleged telephone call to the police officer from the unidentified informant. (Plaintiff's Additional Supplementary Memorandum, No Docket Entry # Assigned, Filed May 29, 1997, henceforth,

"Supplementary Memorandum"). Ferrara, maintains that St. Paul's acts of bad faith constitute sufficient misconduct for purposes of the crime fraud exception to the attorney client privilege.

This court's summary of the factual background, however, is made solely for purposes of resolving the motion to compel.

two 1986 federal district court decisions in Montana and one 1983 state court decision in Arizona, Ferrara maintains that it is entitled to the entire claims file in a bad faith action against the insurer.

Third, as previously noted, Ferrara contends that St. Paul's bad faith conduct justifies application of the crime fraud exception to the attorney client privilege and also vitiates the work product doctrine. Fourth, with respect to the work product doctrine, Ferrara argues that it has a "substantial need" for the entire claims file and cannot without "undue hardship" obtain the equivalent information elsewhere. Finally, Ferrara asserts that the advice of St. Paul's counsel is directly at issue and therefore the opinion work product documents in the claims file are discoverable. (Supplemental Memorandum).

■ Turning to Ferrara's first argument, Ferrara is correct inasmuch as relevance is broadly construed at the discovery stage. *Gagne v. Reddy*, 104 F.R.D. 454, 456 (D.Mass.1984). St. Paul's subsequent production of the entire claims file except for the privileged documents, however, largely moots this argument.

■ Ferrara premises its second argument on the following three cases: *In re Bergeson*, 112 F.R.D. 692 (D.Mont.1986); *Silva v. Fire Insurance Exchange*, 112 F.R.D. 699 (D.Mont.1986); and *Brown v. Superior Court in and for the County of Maricopa*, 137 Ariz. 327, 670 P.2d 725 (1983). As precedent, however, these decisions are not binding with respect to the attorney client privilege. In accordance with Rule 501, Fed. R.Evid., Massachusetts law determines the scope of the attorney client privilege where, as here, jurisdiction is based on diversity. *See Wylie v. Marley Company*, 891 F.2d 1463, 1471 (10th Cir.1989); *Command Transportation, Inc. v. Y.S. Line (USA) Corporation*, 116 F.R.D. 94, 95 (D.Mass.1987). Fur-

ther, the defendant/insurance company in *Brown v. Superior Court in and for the County of Maricopa*, 137 Ariz. 327, 670 P.2d 725, 728–729 (1983), did not object to producing the withheld documents on the basis of the attorney client privilege. Ferrara fails to cite to a Massachusetts case applying a blanket exception to the attorney client privilege in a first party bad faith insurance action. Its second argument in the context of the attorney client privilege is therefore unavailing.

■ The work product doctrine, however, is a federal right derived from the Federal Rules of Civil Procedure and therefore "resolved according to federal law." *In Re Quantum Chemical/Lummus Crest*, 1992 WL 71782 at * 4 (N.D.Ill. April 1, 1992); *accord Pete Rinaldi's Fast Foods, Inc. v. Great American Insurance Companies*, 123 F.R.D. 198, 201 (M.D.N.C.1988) ("federal courts apply federal law, even in diversity cases" to determine work product protection). Consequently, the aforementioned cases cited by Ferrara carry greater weight with respect to Ferrara's work product argument.

■ Nevertheless, Rule 26(b)(3), Fed. R.Civ.P., does not expressly create an exception for work product material generated in a first party bad faith insurance action. Barring such language, it is inappropriate to treat first party bad faith insurance actions differently vis-a-vis other types of actions. While it is true that the claims file often "constitutes the only source of" information relevant to whether the insurance company had a good faith basis for its decision, *In re Bergeson*, 112 F.R.D. at 697; *Silva v. Fire Insurance Exchange*, 112 F.R.D. at 699 (claims file constitutes "sole source of the needed information"),[4] this concern is adequately protected under the substantial need/undue hardship prong of the doctrine. In fact, the court in *Brown v. Superior Court*

---

4. In *Silva*, without much discussion, the court ordered production of the claims file notwithstanding the defendant's objection on the basis of the attorney client privilege. In so doing, the court stated that:

> The time-worn claims of work product and attorney-client privilege cannot be invoked to the insurance company's benefit where the only issue in the case is whether the company breached its duty of good faith in processing the insured's claim.

*Silva v. Fire Insurance Exchange*, 112 F.R.D. at 699–700.

*in and for the County of Maricopa,* 137 Ariz. 327, 670 P.2d 725 (1983), did not apply a blanket exception to all work product in a first party bad faith insurance action. Rather, the court analyzed the production of ordinary work product material in the claims file under the traditional framework of substantial need. *Brown v. Superior Court in and for the County of Maricopa,* 670 P.2d at 734 (finding that " 'substantial equivalent' of this material cannot be obtained through other means of discovery").

Furthermore, the case law cited by Ferrara is not universal. More recent case law rejects "a blanket waiver of privilege and work product protection in a bad faith insurance case." *Dixie Mill Supply Company, Inc. v. Continental Casualty Company,* 168 F.R.D. 554, 558 (E.D.La.1996). Thus, "A simple assertion that an insured cannot otherwise prove her case of bad faith does not *automatically* [emphasis added] permit an insured to rummage through the insurers' claims file.' " *Dixie Mill Supply Company, Inc. v. Continental Casualty Company,* 168 F.R.D. at 559 (internal parentheticals and citation omitted). This court therefore declines to follow *Silva* and *Bergeson* and will instead analyze the work product protection under the customary framework albeit recognizing that the claims file often provides a unique, contemporaneous source of relevant information concerning the insurer's state of mind and its reasons for acting in the manner that it did.

Ferrara next argues that the crime fraud exception vitiates the attorney client privilege as well as the work product doctrine. As "crimes," Ferrara proffers St. Paul's bad faith in returning to the fire based on the alleged telephone call from the unidentified informant, St. Paul's unreasonable delay in responding to Ferrara's claim and St. Paul's March 1997 decision changing its position to pursue a theory of arson on the part of Ferrara. Ferrara submits that the crime/fraud exception encompasses intentional torts and, in particular, bad faith claim settlement practices. Again, however, with the exception of the seminal case of *United States v. United Shoe Machinery Corporation,* 89 F.Supp. 357, 358–359 (D.Mass.1950), Ferrara relies on cases which do not apply Massachusetts law.[5]

In Massachusetts, attorney client communications to further a fraud or crime are not privileged.[6] *In re John Doe Grand Jury Investigation,* 408 Mass. 480, 562 N.E.2d 69, 72 (1990) (" 'there is no privilege between attorney and client where the conferences concern the proposed commission of a crime by the client' "); *Commonwealth v. Dyer,* 243 Mass. 472, 138 N.E. 296, 312, *cert. denied,* 262 U.S. 751, 43 S.Ct. 700, 67 L.Ed. 1214 (1923). Thus, attorney client confidences concerning "present and future criminal activity," *Grieco v. Meachum,* 533 F.2d 713, 718 n. 4 (1st Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), or "the proposed commission of a crime," *In Re John Doe Grand Jury Investigation,* 562 N.E.2d at 72, lie outside the scope of the privilege. The purpose behind the exception is "to assure that the 'seal of secrecy,' ... between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Purcell v. District Attorney for the Suffolk District,* 424 Mass. 109, 676 N.E.2d 436, 439 (1997) (quoting *United States v. Zolin,* 491 U.S. 554, 562–563, 109 S.Ct. 2619, 2625–2627, 105 L.Ed.2d 469 (1989)).

Ferrara bears the burden of showing that the exception applies. *Purcell v. District Attorney for the Suffolk District,* 676 N.E.2d at 439. In addition, facts establishing the crime/fraud exception "must be proved by a preponderance of the evidence." *Purcell v. District Attorney for the Suffolk District,* 676 N.E.2d at 439.

---

**5.** In setting forth the elements of the attorney client privilege, the court in *United Shoe* characterized the exception as "committing a crime or tort." *United States v. United Shoe Machinery Corporation,* 89 F.Supp. at 358.

**6.** As recently noted by the Supreme Judicial Court ("SJC"), "cases have not defined a crime-fraud exception to the attorney-client privilege with any precision." *Purcell v. District Attorney for the Suffolk District,* 424 Mass. 109, 676 N.E.2d 436, 439 (1997).

■ Ferrara proposes that St. Paul's bad faith and unfair claim settlement conduct supports the exception. The SJC in *Purcell,* however, approved the following, more limited definition of the exception:

"If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a *crime or fraud* [emphasis added]."

*Purcell v. District Attorney for the Suffolk District,* 676 N.E.2d at 439 (quoting with approval Rule 502(d)(2) of The Proposed Massachusetts Rules of Evidence). Although *United Shoe* speaks generally in terms of acts done "for the purpose of committing a crime or tort," *United States v. United Shoe Machinery Corporation,* 89 F.Supp. at 358, *Purcell* is the more recent opinion and deals directly with the crime/fraud exception. Accordingly, in light of the aforementioned language limiting the exception to a "crime or fraud," it is inappropriate to extend the exception to an unfair and deceptive trade practice claim.

■ Even assuming, for purposes of argument *only,* that the tort of an unfair and deceptive trade practice during claim processing and/or effectuating settlements is sufficient to warrant applying the crime/fraud exception,[7] Ferrara nevertheless fails to show that St. Paul sought the assistance or advice of counsel "in furtherance of criminal conduct." *Purcell v. District Attorney for the Suffolk District,* 676 N.E.2d at 441. In other words, there must be a showing sufficient to warrant the finding that St. Paul consulted counsel "for the purpose of obtaining advice in furtherance of a crime." *Purcell v. District Attorney for the Suffolk District,* 676 N.E.2d at 440; *see also In Re John*

*Doe Grand Jury Investigation,* 562 N.E.2d at 72 (noting the absence of "any threshold showing in the record that the January 3 conference related to the commission of a future crime").

The earliest date of the communications at issue, July 19, 1994, post dates the February 1994 denial of the claim. None of the conferences at issue concern the delay in responding to Ferrara's claim or the reasons for St. Paul's decision to return to the vessel and conduct a further investigation based on information from a police officer and an unidentified informer. As "evidence" of continuing conduct of unfair and deceptive claim settlement practices, Ferrara also points to the March 1997 change of trial theories. The facts presented, however, fail to set forth an adequate threshold showing that St. Paul consulted counsel for the purpose of receiving advice or assistance in committing an unfair and deceptive act. The exception therefore does .not apply to the communications in the case at bar.[8]

■ Ferrara next asserts that it has a "substantial need" for the work product material and cannot obtain the "substantial equivalent" without "undue hardship." (Supplemental Memorandum). The work product doctrine, codified in Rule 26(b)(3), protects the following: (1) a document or tangible thing; (2) which was prepared in anticipation of litigation; and (3) was prepared by or for a party, or by or for a party's representative. *Pasteris v. Robillard,* 121 F.R.D. 18, 20 (D.Mass.1988). The burden is on the entity resisting disclosure, i.e., St. Paul, to demonstrate that the requested material constitutes work product. *Sham v. Hyannis Heritage House Hotel, Inc.,* 118 F.R.D. 24, 25

---

7. Case law outside Massachusetts as well as the *United Shoe* formulation provides some support for this principle. *See Coleman v. American Broadcasting Companies, Inc.,* 106 F.R.D. 201, 207 (D.D.C.1985) (citing and quoting *United Shoe* as formulating "exception in broader terms," to wit, " 'for the purpose of committing a crime or tort' "); *see also Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 52–53 (M.D.N.C.1987) (recognizing cases which extend the exception "beyond instances of fraudulent or illegal conduct such as patent, antitrust and securities matters" and which may even extend exception "to

non-business torts"); *Horizon of Hope Ministry v. Clark County, Ohio,* 115 F.R.D. 1, 5–6 (S.D.Ohio 1986) (applying exception to conspiracy to violate civil rights); *but see Miller v. Haulmark Transport Systems,* 104 F.R.D. 442, 446 (E.D.Pa. 1984) (collecting cases where only serious wrongdoing justified application of the exception).

8. This finding and reasoning applies equally to Ferrara's claim that the crime/fraud exception abrogates work product protection.

(D.Mass.1987). Having reviewed each document *in camera*, St. Paul more than meets this burden.

■ Even if the material satisfies this test, it is still discoverable upon a showing that the party seeking discovery has a "substantial need" for the materials and cannot obtain the "substantial equivalent" of the materials without "undue hardship." Fed. R.Civ.P. 26(b)(3); *Connelly v. Dun & Bradstreet, Inc.*, 96 F.R.D. 339, 343 (D.Mass.1982). Determining "substantial need" necessarily requires understanding the substance of Ferrara's claims. In this respect, Ferrara generally maintains that the claims file consists of crucial information unavailable from other sources. St. Paul, however, produced the bulk of the claims file except for 20 documents constituting work product.[9] The deposition of Pamela L. Shepardson contains detailed information concerning the processing of Ferrara's claim and the reasons for denying it. Thus, Ferrara already possesses a significant amount of information which details the manner in which St. Paul processed the claim and its conduct leading to the alleged delay in denying the claim in February 1994. *See, e.g., Connelly v. Dun & Bradstreet, Inc.*, 96 F.R.D. at 343 (denying motion to compel and noting that, "substantial information dealing with class certification has already been tendered to the defendant"). Through telephone conversations with St. Paul's counsel, Ferrara also has information concerning St. Paul's March 1997 decision to change trial theories.

More specifically, however, Ferrara also asserts that St. Paul failed to settle the claim after it became clear that its defense of arson was no longer reasonable. (Supplemental Memorandum). Ferrara posits that this occurred as early as August 1995. Documents in the claims file after February 1994 might be relevant to this allegation which therefore merits closer consideration of Ferrara's causes of action in order to determine "substantial need."

■ As previously noted, Count II alleges a violation of chapter 176D while Count III alleges a violation of section nine of chapter 93A. Turning to the chapter 176D count, section three defines "unfair or deceptive acts or practices in the business of insurance" as including "unfair claim settlement practices" under subparagraph nine. Subparagraph nine defines "unfair claim settlement practices" as including acts which fail "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *See generally Clegg v. Butler*, 424 Mass. 413, 676 N.E.2d 1134, 1140 (1997) (duty to settle under § 3(9)(f) "does not arise until 'liability has become reasonably clear'" which "encompasses both fault and damages"). The problem with St. Paul's alleged liability for failing to effectuate settlements when liability became reasonably clear, however, is that chapter 176D, by itself, "provides no private cause of action and is enforceable only by the commissioner of insurance." *Thorpe v. Mutual of Omaha Insurance Company*, 984 F.2d 541, 544 n. 1 (1st Cir.1993); *accord Ryan v. Fallon Community Health Plan*, 921 F.Supp. 34, 38 (D.Mass.1996) (case law "indicates that no private right of action generally exists under Chapter 176D standing alone").

With respect to the chapter 93A count, Ferrara might argue that a violation of chapter 176D automatically constitutes a violation of chapter 93A. Ferrara's contention has merit with respect to a section nine/chapter 93A plaintiff but not with respect to a section 11/chapter 93A plaintiff. Section 9(1) of chapter 93A gives a cause of action to, "Any person, other than a person entitled to bring an action under section eleven of this chapter, ... whose rights are affected by another person violating the provisions of clause (9) of section three of chapter [176D]." Mass. Gen. L. ch. 93A, § 9(1). Section 11, which does not expressly incorporate chapter 176D, provides a cause of action to redress unfair or deceptive acts or practices.[10] A section 11

---

**9.** St. Paul also declines to produce an additional 31 documents on the basis of the attorney client privilege.

**10.** Section 2 of Chapter 93A declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. ch. 93A, § 2(a).

plaintiff is "any person who engages in the conduct of any trade or commerce." Mass. Gen. L. ch. 93A. In other words, section 11 requires an interaction which "is 'commercial' in nature" between two parties "engaged in 'trade or commerce.'" *Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 679 N.E.2d 191 (1997); *see also Kerlinsky v. Fidelity & Deposit Company of Maryland*, 690 F.Supp. 1112, 1117 (D.Mass.1987), *aff'd*, 843 F.2d 1383 (1st Cir.1988).

Persons whose rights are affected by violations of section 3(9)(f) of chapter 176D are therefore entitled to relief under section nine of chapter 93A. *See Van Dyke v. St. Paul Fire and Marine Insurance Company*, 388 Mass. 671, 448 N.E.2d 357, 360 (1983). In contrast, persons engaged in trade or commerce may sue insurance companies under section 11 "but an insurer's violations of ch. 176D, § 3(9) do not themselves create a cause of action under § 11." *F.C.I. Realty Trust v. Aetna Casualty & Surety Company*, 906 F.Supp. 30, 32 n. 1 (D.Mass.1995). While the insurer's alleged behavior might fall within the confines of section 2 as an unfair or deceptive act, "a violation of chapter 176D does not automatically violate § 2." *F.C.I. Realty Trust v. Aetna Casualty & Surety Company*, 906 F.Supp. at 32 n. 1; *accord Polaroid Corporation v. Travelers Indemnity Company*, 414 Mass. 747, 610 N.E.2d 912, 917 (1993) ("Polaroid's claim that G.L. c. 93A, § 11, was violated by its primary insurers' violations of certain provisions of G.L. c. 176d, § 3, cl. 9, is of significance only to the extent that the alleged wrongful conduct was a violation of G.L. c. 93a, § 2"); *Jet Line Services v. American Employers Insurance Company*, 404 Mass. 706, 537 N.E.2d 107, 114 n. 11 (1989) (" § 11 does not incorporate violations of G.L. c. 176d, § 3(9), within its prohibitions as does G.L. c. 93a, § 9"); *Kiewit Construction Company v. Westchester Fire Insurance Company*, 878 F.Supp. 298, 301–302 (D.Mass.1995); *Employers Insurance of Wausau v. George, Jr.*, 41 Mass.App.Ct. 719, 673 N.E.2d 572, 579 (1996), *review denied*, 424 Mass. 1104, 676 N.E.2d 55 (1997) (violation of chapter 176D, § 3(9) is significant for a business plaintiff "only to the extent that the alleged wrongful conduct violated G.L. c. 93A, § 2"); *C & W Industries, Inc. v. Sentry Insurance A Mutual Company*, 1995 WL 808888 at * 4 (Mass.Super. Feb.23, 1995) (the plaintiff/policy holder "may not rely exclusively on the unfair claim settlement practices enumerated in G.L. c. 176d, § 3(9) because § 11 does not grant an independent right to recover for violations of c. 176D, as § 9 does").

■ For purposes of this opinion only, the record shows that Ferrara was engaged in trade or commerce. The insurance policy entered into by Ferrara & DiMercurio, Inc., a Massachusetts corporation, "Warranted that the insured vessel shall only be used for commercial fishing." (Docket Entry # 44, Ex. A, Endorsement No. 1). O'Donnell describes the vessel as "a 71–foot steel fishing trawler." (Claims File, Nonprivileged Material). On July 2, 1993, the day before the fire, the vessel had just "returned from a five day fishing voyage." (Claims File, Nonprivileged Material). The numerous settlement sheets in the claims file further reflect that the vessel and Ferrara were engaged in trade or commerce. Ferrara's chapter 93A claim therefore falls under section 11. *See, e.g., C & W Industries, Inc. v. Sentry Insurance A Mutual Company*, 1995 WL 808888 at * 4 (Mass.Super. Feb. 23, 1995) (insurance coverage dispute between corporation and insurance company governed by section 11).

Under section 11, a business practice is considered "unfair if it is 'within the penumbra of some common-law, *statutory* [emphasis added] or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen.'" *Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 679 N.E.2d 191 (1997) (quoting *PMP Associates, Inc. v. Globe Newspaper Company*, 366 Mass. 593, 321 N.E.2d 915 (1975), with internal quotation marks and ellipsis omitted). Conduct which violates section 3(9)(f) of chapter 176D, i.e., failing to promptly effectuate settlements when liability becomes reasonably clear, may therefore support liability under sections 2 and 11 of chapter 93A, *see Kiewit Construction Company v. Westchester Fire Insurance Company*, 878 F.Supp. at 302; *Alan Corporation v. International Surplus Lines Insurance*

*Company*, 823 F.Supp. 33, 43 n. 4 (D.Mass. 1993), *aff'd*, 22 F.3d 339 (1st Cir.1994), but a finding that St. Paul violated chapter 176D does not establish a violation of section 11 of chapter 93A.

In addition, although an intent to deceive is not required for liability under chapter 93A, *Pediatricians, Inc. v. Provident Life & Accident Insurance ·Company*, 965 F.2d 1164, 1171 (1st Cir.1992); *accord Equitable Life Assurance Society of the United States v. Porter–Englehart*, 867 F.2d 79, 89 (1st Cir.1989) (insurance company's "perceived good faith was not the dispositive issue" under chapter 93A), Ferrara also claims that St. Paul's conduct was wilful and/or knowing. (Docket Entry # 1, ¶ 15). Thus, repeated instances of St. Paul's failure to settle the claim once liability was reasonably clear are relevant but not necessarily dispositive of Ferrara's section 11 chapter 93A claim. Whether St. Paul officials knew that liability was reasonably clear is also relevant to Ferrara's section 11 chapter 93A claim. To the extent the work product documents provide a unique source or the only evidence to support these allegations, Ferrara may have a substantial need for such documents which he cannot obtain without undue hardship.

▆ St. Paul seeks work product protection for documents six, 21 through 25, 27, 28, 30 through 36, 42 and 43.[11] Document 6 is a four page memorandum to the file authored by Rhonda Leake ("Leake"), a St. Paul Claim Representative. Ferrara does not have a substantial need for information on the first page which is already contained in the claims file. The second page describes a telephone call with St. Paul's counsel and is protected by the attorney client privilege except for the last two paragraphs.[12] The remainder of the document consists of Leake's subjective assessment of the merits of Ferrara's claim. As such, it is directly relevant as to whether St. Paul knew that liability was reasonably clear. *See, e.g., Walters v. State Farm Mutual Auto Insurance Company*, 141 F.R.D. 307, 308 (D.Mont.1990). This portion of the document, however, is entirely opinion work product and therefore remains protected unless directly at issue, as discussed *infra*.

▆ Documents 21 through 25, 27, 28, 30, 31, 34 and 35 consist of work product material and, in particular, St. Paul's efforts to obtain a file. Ferrara does not have a substantial need for such information in order to establish the chapter 93A claim. Documents 32, 33 and 36 are work product materials and not relevant to the chapter 93A claim. Furthermore, documents 32 and 33 contain the mental impressions of a St. Paul Claim Supervisor. Ferrara has the substantial equivalent of document 42, which constitutes work product, inasmuch as the majority of the information therein is contained in the deposition of Pamela L. Shepardson, the author of the document. Ferrara lacks a substantial need for document 43, an internal St. Paul memorandum dated April 10, 1995, which

---

11. St. Paul also seeks work product protection for: (1) document three, a March 10, 1997 pretrial report; (2) document seven, a February 28, 1997 letter from St. Paul's counsel to a St. Paul Claim Representative; (3) document 15, a memorandum to the file by the St. Paul Claim Representative concerning the content of a telephone conversation with St. Paul's counsel; and (4) document 49, a December 20, 1994 letter from St. Paul's counsel to the aforementioned St. Paul Claim Representative. St. Paul additionally submits that these documents are covered by the attorney client privilege. This court agrees. It is therefore not necessary to assess the work product protection afforded these documents.

The attorney client privilege protects communications made between the client and the attorney for the purpose of obtaining legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *Matter of John Doe Grand Jury Investigation*, 408 Mass. 480, 562 N.E.2d 69, 70 (1990).

The pretrial report, authored by a St. Paul Claim Unit Manager and addressed to Philip Broderick, one of the decision makers who denied the claim (Claims File, Nonprivileged Material, Pamela L. Shepardson Deposition, p. 11), concerns legal advice and attaches three letters from counsel to the Claim Unit Manager. The February 28, 1997 and December 20, 1994 letters from St. Paul's counsel are confidential communications made between counsel and client. The telephone notes reflect confidential communications, as opposed to facts, between St. Paul's counsel and the St. Paul Claim Representative.

12. St. Paul submits ·that the attorney client privilege as well as the work product doctrine protects document six. The remainder of the document is not subject to the attorney client privilege.

predates the August 1995 decision of the trial judge. The document is only marginally relevant to Ferrara's chapter 93A claim.

Thus, the only remaining work product document subject to disclosure is document six, specifically, the last two paragraphs of page two and pages three and four. As a final argument, Ferrara asserts that opinion work product is not sacrosanct where, as here, the advice of counsel is directly at issue. (Supplemental Memorandum). Case law supports Ferrara's position. Although opinion work product requires a stronger showing than ordinary work product, it is not absolutely immune from discovery. *See Micron Separations, Inc. v. Pall Corporation*, 159 F.R.D. 361, 364 (D.Mass. 1995). Rather, opinion work product is subject to discovery where the mental impressions of counsel are directly at issue. *Holmgren v. State Farm Mutual Automobile Insurance Company*, 976 F.2d 573, 577 (9th Cir.1992) (opinion work product subject to discovery "when mental impressions are at issue in a case and the need for the material is compelling"); *Dixie Mill Supply Company, Inc. v. Continental Casualty Company*, 168 F.R.D. at 559 (recognizing that opinion work product subject to discovery upon heightened showing of compelling need); *Hartman v. Banks*, 164 F.R.D. 167, 170 (E.D.Pa.1995) (opinion work product can be discovered where opinions of attorney are at issue); *Reavis v. Metropolitan Property and Liability Insurance Company*, 117 F.R.D. 160, 164 (S.D.Ca.1987) (courts allow exception to Rule 26(b)(3) where "mental impressions and opinions are directly at issue"); *Kockums Industries Limited v. Salem Equipment, Inc.*, 561 F.Supp. 168, 172–173 (D.Or.1983); *see also In Re Sunrise Securities Litigation*, 130 F.R.D. 560, 566–568 (E.D.Pa.1989) (fully discussing the exception and setting forth cases involving insurance policies); *see, e.g., Charlotte Motor Speedway, Inc. v. International Insurance Company*, 125 F.R.D. 127, 130–131 (M.D.N.C. 1989); *but see Duplan Corporation v. Moulinage et Retorderie de Chavanoz*, 509 F.2d 730, 734–735 (4th Cir.1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). In light of this case law, the portions of document six which remain subject to disclosure lose their protection.

Having reviewed each of the remaining documents noted on the privilege log, they are all protected by the attorney client privilege. These documents generally consist of confidential communications between St. Paul's counsel and the St. Paul Claim Representative and/or the Claim Supervisor. Such confidential communications reflecting the legal advice of St. Paul's counsel fall within the confines of the attorney client privilege.

### CONCLUSION

Ferrara's motion to compel (Docket Entry # 72) is **ALLOWED** to the extent that St. Paul is ordered to produce a redacted version of document six as previously described on or before June 9, 1997. The motion (Docket Entry # 72) is otherwise **DENIED.** Counsel shall be notified of this Order by telephone.